IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SUE JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 03-PWG-1702-S |
| | ) |
| MORRIS BART, P.L.C., | ) |
| | ) |
| Defendant/Third-Party Plaintiff/ | ) |
| Cross-Claim Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| LAW OFFICES OF MICHAEL T. | ) |
| GALLAGHER a/k/a or d/b/a | ) |
| GALLAGHER, LEWIS, DOWNEY & | ) |
| KIM, and MICHAEL T. GALLAGHER, | ) |
| | ) |
| Third-Party Defendants | ) |
| | ) |
| BEN C. MARTIN and the LAW FIRM | ) |
| OFFICES OF BEN C. MARTIN, | ) |
| | ) |
| Fourth-Party Defendants. | ) |

MEMORANDUM OPINION

Sue Jackson, plaintiff, brought this action under the Alabama Legal Services Liability Act, § 6-5-570, *Code of Alabama*. This action was originally filed in state court but was removed to federal court by defendants based on diversity of jurisdiction. Jackson has sued Morris L. Bart, P.L.C., Morris Bart, individually, Gallagher, Lewis, Downey & Kim and Michael T. Gallagher for their representation of her in connection with a "Fen-Phen" settlement.[1] The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 72.3.

---

[1]  Lisa Cazaubon was dismissed as a defendant on July 21, 2003.

This matter is before the court on the Motion for Summary Judgment filed by Morris Bart, P.L.C., and Morris Bart, individually, (doc. # 66) and the Joinder in the Motion for Summary Judgment filed by Gallagher, Lewis, Downey & Kim and Michael T. Gallagher (doc. # 69).

SUMMARY JUDGMENT STANDARD

The party which seeks summary judgment "always bears the initial responsibility of informing the district court of the basis for its motions, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met that initial burden, Rule 56(e) "requires that the non-moving party go beyond the pleadings and by [its] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324, 106 S.Ct. 2548. To avoid summary judgment, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences drawn in favor of the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 255, 106 S.Ct. 262 . 91 L.Ed. 202 (1986).

The following facts are undisputed, or, if disputed, viewed in the light most favorable to plaintiff. According to her second amended complaint, Sue Jackson received a prescription for sixty Redux capsules in September of 1997.[2/] Two days after the medicine was prescribed for Ms.

---

[2/] Presumably she took some or all of the capsules although the complaint does not actually say that she did.

Jackson, American Home Products Corporation ("AHPC") withdrew Redux from the market. Both before and after Ms. Jackson received her prescription for her sixty pills, a number of consumers had sued AHPC alleging various medical problems arose from the use of Redux particularly when taken together with another drug developed by AHPC, Pondimin. The combination of these drugs frequently prescribed for weight loss was known as "Fen-Phen." These lawsuits were proliferating in the Fall of 1999. The number of lawsuits involving "Fen-Phen" soon warranted a judicial panel for multi-district litigation which transferred many such cases to the Eastern District of Pennsylvania. In November of 1999 a National Class Action Settlement Agreement was tentatively reached. Ms. Jackson states that in August of 1999 a Texas jury awarded 23.4 million dollars to a "Fen-Phen" plaintiff. Ms. Jackson avers that it was after this judgment that the National Settlement Agreement was reached in the Eastern District of Pennsylvania. Also in August of 1999 five plaintiffs represented by attorney Michael T. Gallagher obtained a 150 million dollar verdict in a Mississippi state court upon allegations of medical problems from "Fen-Phen." Papers attached to the second amended complaint indicate that after his success in obtaining the substantial verdict in the state law case, Mr. Gallagher stated that class action settlement agreements, presumably including that reached in the Eastern District of Pennsylvania, did not provide sufficient benefit to potential plaintiffs. At about this same time another attorney, Morris Bart and/or Morris Bart, P.L.C., based in Louisiana with offices in Mississippi, began an advertising campaign for clients in states including Alabama. Bart's advertising urged "Fen-Phen" users to opt out of the National Settlement Agreement. In February of 2000, Bart and Gallagher joined forces to undertake representation of consumers of "Fen-Phen" an action against AHPC. These claimants had in some cases already "opted out" of the National Settlement Agreement. Others responded to Bart's

advertising campaign. The extensive advertising included television advertising in the Birmingham, Alabama market. In response to such the television solicitation, Sue Jackson, the apparent consumer of sixty Redux pills, called Morris Bart's Birmingham, Alabama telephone contact number. On February 8, 2000 Bart and Bart, P.L.C. mailed Ms. Jackson a letter which included, among other things, a medical release for her signature and an "opt-out" form with which she would exercise her right to opt-out of the National Settlement Agreement. On February 22, 2000 Ms. Jackson returned the medical release form, mailed the opt-out form and also executed an attorney client agreement form. The attorney client form stated that the Bart law firm would pay for any required "medical evaluation" in support of her claim. In addition to Ms. Jackson, the Bart and Gallagher cabal undertook to represent more than seven hundred more "Fen-Phen" plaintiffs.[3]

Meanwhile, in August of 2000 the National Class Action Settlement was approved in the Eastern District of Pennsylvania.[4] The order certifying the class referred to a number of studies which had concluded that many middle-aged women had taken the "Fen-Phen" combination between January of 1995 and September of 1997.[5] The order certifying the class also cited situations observing that an echo-cardiogram is a useful tool for determining whether a "Fen-Phen" plaintiff had suffered heart valve damage, one of the medical conditions linked to "Fen-Phen" consumption. The assessment of the degree of valvular heart damage through the use of an echo-cardiogram was

---

[3] Ms. Jackson's claim appears to be merely a "Fen" claim rather than a "Fen-Phen" claim in that she does not aver in her complaint that she ever took or had a prescription for Pondimin or the combination of drugs that comprised the bulk of such litigation.

[4] Ms. Jackson's second amended complaint quotes extensively from the order certifying the National Class without a great deal of effort to relate her own claims to the cited passages of that order.

[5] Ms. Jackson's sixty pills would presumably have been the last available to her in light of the withdrawal of the product from the market two days after she obtained the prescription. Her sixty pills may well have been the first she consumed in that she does not indicate any where in the complaint that prior to the September 13, 1997 prescription she had taken the drug.

referred to frequently in the order certifying the class.[6] One condition associated with heart valve damage referred to in the order was valvular regurgitation, which resulted in blood leaking back into the heart through a diseased valve. The degrees of valvular regurgitation accordingly to in the order certifying the class as quoted in Ms. Jackson's complaint are characterized as trace, mild, moderate or severe. Aortic regurgitation, according to the studies quoted in the order certifying the class and in turn cited in Ms. Jackson's complaint posed two distinct health risks. The August 28, 2000 order certifying the class indicated the usefulness of an echo-cardiogram but did not order that such examinations be made.

Of more importance to this litigation was that the agreement in the National Class Action established a compensation grid or matrix to be used to assess the potential recovery for an individual claimant without the necessity of proof that the injuries were in fact caused by the using Pondimin and Redux. In October of 2000 the Morris Bart law firm received a letter affirming that Ms. Jackson had opted-out of the National Settlement Agreement as the attorneys had suggested. On November 1, 2000 Ms. Jackson forwarded to the Bart law firm proof from her pharmacy that she had in fact been prescribed sixty Redux capsules in September of 1997. Less than two weeks later Gallagher, an attorney with whom Jackson had had no previous contact, mailed a letter to Jackson informing her that "an excellent settlement" offer had been received on behalf of the "opt-out plaintiffs." Ms. Jackson was informed that in order to participate in the settlement, she was to sign and return a disclosure and release form "immediately." On November 21, 2000 Jackson signed a Settlement Disclosure to Clients authorizing her attorneys to proceed with the Settlement. On

---

[6]  Ms. Jackson avers that both Bart and Gallagher read the settlement papers and the order certifying the class. She also states that Gallagher was aware of the value of the echocardiogram because he introduced such evidence at the Mississippi trial.

November 30, 2000 Jackson signed a Release against American Home Products Corporation. Ms. Jackson avers that Gallagher and Bart "settled" 2902 claims which "... yielded them an astronomical attorney's fee, but provide[d] only a de minimus 'no-injury' settlement to the plaintiff Sue Jackson."

The settlement of the "opt-out" cases, according to Jackson, was known as the "Diet Drug II Qualified Settlement." Like the National Settlement Agreement, the opt-out plaintiffs' settlement did not require actual proof of causation that whatever heart condition a plaintiff may have had was actually caused by the consumption of "Fen-Phen" or, in Ms. Jackson's case, of "Fen." The only proof of "injury" required by the agreement was an echo-cardiogram which would demonstrate the degree, if any, of actual injury. It is undisputed that no echo-cardiogram was submitted to the claims administrator on behalf of Ms. Jackson. Ms. Jackson contends that because no echo-cardiogram was submitted to the claims administrator, she received only a "no injury" award.

On March 8, 2001 the Bart law firm mailed a letter to Jackson and others informing them that the Special Master was in the process of completing the "evaluations." On March 22, 2001 Bart wrote Jackson to tell her that her "Fen-Phen" check had arrived. On April 3, 2001 Ms. Jackson, together with a large number of other clients of Morris Bart, arrived at the Birmingham office.[7/] She avers that she was told that she was to immediately sign a release in order to obtain her settlement check. On April 3, 2001 Jackson signed a release and acknowledgment of receipt of $6,841.83. On August 9, 2001 Ms. Jackson, now identified as a "'Fen-Phen' client" received another letter from Morris Bart informing her that excess settlement funds were being distributed to the "no-injury" payout claimants including Ms. Jackson. The letter, which informed Ms. Jackson that she would

---

[7/]     Ms. Jackson states that the line of claimants stretched out the door of the office.

be receiving "additional money" also told her that this was a "FULL AND FINAL SETTLEMENT." (Capitalization in the complaint at p.29).

On August 14, 2001 Ms. Jackson obtained an echo-cardiogram which indicated that she had "mild aortic regurgitation" which would have qualified her under the "injury criteria" of the "Diet Drug II Qualified Settlement" (the opt-out claimants' settlement). Ms. Jackson signed a settlement distribution sheet on August 17, 2001 acknowledging receipt of $2,333.33. On September 9, 2001 the Morris Bart, P.L.C. firm forwarded to Ms. Jackson the second installment of her "no-injury settlement." On February 20, 2002 Ms. Jackson claims that she first learned that additional claims against AHPC were barred when she consulted another lawyer. In its simplest terms, this litigation is premised upon Ms. Jackson's claim that but for the venality and ineptitude of her lawyers she would have received a damage award of "X" rather than "Y" as the result of the September 13, 1997 prescription for sixty Redux capsules. Ms. Jackson maintains that had her lawyers merely submitted the results of an echo-cardiogram with her claim she would have obtained the larger compensatory award because under the settlement agreement she was not required to actually prove that the prescription for sixty Redux pills had anything whatsoever to do with the mild aortic regurgitation condition observed in August of 2001.

Defendants assert that Ms. Jackson's claims are barred by § 6-5-574, *Code of Alabama*, which codifies the statute of limitations on legal liability actions.[8] Because Ms. Jackson's claims arise under the law of the state of Alabama and federal jurisdiction is predicated upon the diversity

---

[8] In a related case United States District Judge David R. Proctor has disagreed with the defendants's contention that Ms. Jackson's action is presently time-barred. For the reasons more fully set forth below this court also finds aspects of Ms. Jackson's claims are not currently barred by § 6-5-574.

of citizenship, Alabama law provides the applicable statute of limitations. See *Guaranty Trust of New York v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

The Alabama Legal Service Liability Act (ALSLA) provides the exclusive remedy for "[a]ny action against a legal service provider in which it is alleged that some injury or damage was caused in whole or in part by the legal service provider's violation of the standard of care applicable to a legal service provider...." *Alabama Code*, § 6-5-572 (1988).[9] Section 6-5-574 of the statute provides:

> (a) All legal service liability actions against a legal service provider must be commenced within two years after the act or omission or failure giving rise to the claim, and not afterward; provided, that if the cause of action is not discovered and could not reasonably have been discovered within such period, then the action maybe commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier; provided, further, that in no event may the action be commenced more than four years after such act or omission or failure; except, that an act or omission or failure giving rise to a claim which occurred before August 1, 1987, shall not in any event be barred until the expiration of one year from such date.
>
> (b) Subsection (a) of this section shall be subject to all existing provisions of law relating to the computation of statutory periods of limitation for the commencement of actions, namely, sections ..., 6-2-3, ... provided, that not withstanding any provisions of such sections, no actions shall be commenced more than four years after the act, omission, or failure complained of; ...

---

[9] The statute makes clear that such an action includes any cause of action in which a litigant seeks redress for legal services claims whether predicated upon earlier, law actions or by statute.

§ 6-5-574, **Limitation on Time for Commencement of Legal Services Liability Action. (*Code of Alabama* (1975)).**

Section 6-2-3 provides:

> In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.

Defendants maintain that the cause of action accrued and the statute of limitations began to run on or before November 30, 2000, the date that Ms. Jackson accepted the allegedly deficient settlement and agreed to receive an unspecified sum to be decided by the Special Master. Defendants argue that Ms. Jackson then had two years, until November 30, 2002 in which to file suit. This lawsuit was filed on May 23, 2003.

Ms. Jackson argues that she is entitled to the two year "discovery period" under § 6-2-3. Ms Jackson contends that she had no reason to know until August 2001 that she had received a "no injury" settlement and that she had no reason to suspect that her attorneys had signed a MSD ensuring them one third of $358,000,000 without regard to the medical condition of their clients until February 2004.

In response, defendants argue that Ms. Jackson cannot employ the two year statute of limitations for fraud because the fraud provision of § 6-2-3 applies only when a plaintiff discovers her cause of action after the ALSLA's statute of limitation has barred her lawsuit and in this case Ms. Jackson had knowledge of the alleged legal malpractice claims against defendant Bart in February 2002 when she consulted with a malpractice attorney, nine months prior to the expiration of the 2 year statute of limitation under the ALSLA. In a memorandum opinion entered in CV 03-P-

9

1704-S, Judge Proctor relied on the plain language of § 6-2-3 providing that a plaintiff "must have two years" within which to prosecute her action after discovery as his basis for concluding that "Section 6-2-3 serves as a tolling provision, allowing Plaintiff to rely on its two year limitation period *without regard* to whether her claim would be barred under Section 6-5-574(a)." Subsequent to Judge Proctor's decision, the Alabama Court of Civil Appeals held *in the context of an ALSLA action* that § 6-2-3 applies not only to fraud actions but also to any cause of action that has been fraudulently concealed from a plaintiff. *Rutledge v. Freeman*, ____ So.2d ____, 2004 W.L. 1908316 (Ala. Civ. App. 2004). Further, the *Rutledge* court specifically held that § 6-2-3 acts as a tolling statute and thus the application statute of limitations does not have to have expired on the plaintiff's claim in order for § 6-2-3 to apply, relying on *Ryan v. Charles Townsend Ford, Inc.*, 409 So.2d 784 (Ala. 1981) and *Van Antwerp v. Van Antwerp*, 242 Ala. 92, 5 S.2d 73 (1941).

Many of the same instances of fraud relied upon by the plaintiff in CV 03-P-1704-S, *Hardin v. Bart*, are also relied upon by the Ms. Jackson in this case specifically suppression of the following: (1) plaintiff's "no injury" status, (2) the terms of Plaintiff's settlement under the matrix, (3) defendants' failure to obtain any of plaintiff's medical records under the medical authorization they obtained, (4) the disparate payment ranges in the matrix, (5) the terms of compensation to defendants upon settlement of claims, and (6) the identity of her co-plaintiffs. Ms. Jackson maintains that she could not have discovered many of her allegations against defendants until after the December 2003 disclosure of Gallagher that he had done nothing to represent Jackson as an individual and the February 2004 disclosure of the Master Settlement Document and matrix. Because it is clear that some of the claims are based on fraudulent concealment and there is

insufficient evidence to determine which, if any, of the "non-fraud" claims accrued on or before May 23, 2001, defendants' motion for summary judgment is due to be denied.

A separate order consistent with this Memorandum of Opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 18th day of January, 2005.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE